UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
THOMAS M. GRAFF, an individual; on behalf
of himself and all others similarly situated,

                       **MEMORANDUM &**
                       **ORDER**

         Plaintiffs,                    No. 12-CV-2402 (GRB)
      v.

UNITED COLLECTION BUREAU, INC., an
Ohio Corporation,

         Defendant.
----------------------------------------------------------------------X
**GARY R. BROWN, United States Magistrate Judge:**

      Following the provision of notice to 568,023 potential class members in this action

brought pursuant to the FDCPA, the parties now move to, *inter alia*, obtain final certification of

a class action and approval of a negotiated *cy pres* settlement principally involving the payment

of (1) approximately $40,000 to a public interest organization (representing 1% of defendant's

net worth and about 7¢ per class member); (2) $2,500 to the representative plaintiff; (3) notice

and administration costs of up to $250,000 and (4) attorneys' fees of $175,000.  One class

member opposes the settlement, objecting to a number of items, including the breadth of the

release, the geographic scope of the class, adequacy of notice and the validity and

constitutionality of the consent by the parties to the exercise of jurisdiction by a U.S. Magistrate

Judge.

      For the reasons set forth herein, I find that the consent to jurisdiction survives the

challenges raised by the plaintiff-objector, but that several other objections require modification

of the proposed class and rejection of the settlement.

# BACKGROUND

## Allegations Contained in the Complaints

Plaintiff Graff commenced this action through filing of a complaint dated May 15, 2012, DE 1, and brought on behalf of himself and "all [similarly affected] persons in the State of New York" (the "New York class"). Compl. ¶ 76.   A first amended complaint, DE 54, filed on consent of the parties on June 26, 2014 -- apparently as part of the settlement negotiations -- seeks relief for the New York class and a class of all similarly affected individuals in the United States (the "Nationwide class"). Am. Compl. ¶ 78.   These two pleadings are otherwise identical in all relevant respects.

The amended complaint alleges the following:  Sometime before December 2011, plaintiff Graff incurred a personal debt to Citibank, N.A.  *Id.* ¶ 14.  Citibank transferred that debt to UCB, one of the nation's largest asset recovery agencies.  *Id.* ¶¶ 17-18.  USB is a debt collector as defined by 15 U.S.C. § 1692a(6).  *Id.* ¶ 20.  In endeavoring to collect debts from Graff and other similarly situated plaintiffs, UCB left voicemail and/or answering machine messages which failed to identify UCB either by name or as a debt collector, and failed to reveal that the purpose of the call was debt collection.  *Id.* ¶¶ 24-30.

The amended complaint identifies an earlier litigation involving the very same activity at issue here in a nationwide class action, *Joann Gravina, et al. v.United Collection Bureau, Inc., et al.*, 09-CV-04816(LDW).  *Id.* ¶¶ 34-35.  That class action was resolved for the payment of $122,508, including no payment to any class member other than the named plaintiffs, approximately $26,500 in *cy pres* payments to two charities, and attorneys' fees and costs. *Gravina v. United Collection Bureau, Inc.,* 2010 WL 9075409 (E.D.N.Y. Nov. 29, 2010)

("*Gravina* Settlement Order"); *but see Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218 (2d Cir. 2012)(holding that Settlement Order lacked *res judicata* effect due to insufficient notice). The *Gravina* Settlement Order, entered on November 9, 2010, which is attached to and incorporated into the amended complaint, also contained a permanent[1] injunction requiring defendants to:

> "use its best efforts to ensure that it meaningfully identifies itself by stating its company name as the caller, accurately stating the purpose or nature of the communication, and disclosing that the communication is from a debt collector"

Am. Compl., Ex. A, ¶7. The amended complaint alleges that notwithstanding the injunction and other relief imposed in *Gravina*, defendant continued engaging in the prohibited activity, to wit: leaving messages failing to identify UCB by name or as a debt collector. *Id.* ¶¶ 88-89. Notably, William Horn, Esq. represented plaintiffs in both *Gravina* and the instant case, though with different co-counsel; similarly, Barry Jacobs, Esq. represented UCB in both cases.

The amended complaint, like that in *Gravina*, states a single cause of action under the FDCPA based upon the above-described messages.

### *Consent to Magistrate Judge Jurisdiction*

On or about April 25, 2014, counsel for representative plaintiff Thomas Graff and for defendant executed a notice consenting to the exercise of jurisdiction over this matter by the undersigned. DE 49. On April 28, 2014, the Honorable Joanna Seybert executed an order, pursuant to 28. U.S.C. §636(c) and Fed.R.Civ.P. 73 referring the case to the undersigned "to conduct all proceedings and order the entry of a final judgment." DE 50.

### Provision of Notice to the Class

---

[1] Following settlement of a motion for contempt in *Gravina*, that motion was withdrawn and, upon consent of the parties, the permanent injunction was "dissolved and extinguished." *Gravina,* CV 09-4816, DE 49.

On October 24, 2014, the Court approved plaintiffs' proposed Notice Plan to the settlement class. *See* Preliminary Approval Order, DE 60. In particular, the plan provided for a short-form notice on a postcard sent directly by mail to each potential class member reading as follows:

**The United States District Court for the Eastern District of New York authorized this Notice.**
**This is not a solicitation from a lawyer.**

**Why Are You Receiving This Notice?** This Notice provides you summary information about a lawsuit involving debt collection practices of United Collection Bureau, Inc. ("UCB"). You have been identified as a class member in this lawsuit. THE COURT RECENTLY ENTERED AN ORDER IN THE LAWSUIT THAT MAY AFFECT YOUR LEGAL RIGHTS.

**What is the Lawsuit About?** A New York consumer for whom UCB left a telephonic voice message in an attempt to collect debt has sued UCB alleging its telephone messages failed to identify UCB by its full company name and disclose that the call was for collection purposes in violation of a federal law called the Fair Debt Collection Practices Act ("FDCPA"). UCB denies these allegations.

**Who Are The People Involved In The Case?** The Court has allowed the lawsuit to proceed as a class action on behalf of the following consumers: (1) All persons in the United States of America, for whom UCB left a telephonic voice message at a number, that did not identify UCB by its full company name or state that the call was for collection purposes, made in connection with UCB's attempt to collect a debt, during the period of February 19, 2013 through October 29, 2014; and (2) All persons with addresses in the State of New York, for whom UCB left a telephonic voice message at a number, that did not identify UCB by its full company name or state that the call was for collection purposes, made in connection with UCB's attempt to collect a debt, during the period of May 15, 2011, through October 29, 2014. More detailed information concerning the class members' claims is available at www.UnitedCollectionBureauSettlement.com, or by calling 1-844-245-3775.

**Is There Money Available to the Class?** No. This lawsuit only seeks statutory damages, which is limited by the FDCPA to $39,819.43. Because there are at least 526,954 class members each person would only receive seven cents (7¢). Instead, UCB has agreed to pay the entire $39,819.43, on behalf of the class, to the National Consumer Law Center, which is a charitable organization whose primary focus is to assist low-income consumers throughout the United States of America with respect to consumer debts.

**What Do I Need To Do Now?** Because your rights are affected, you have a choice to make now: ASK TO BE EXCLUDED: You keep the right to sue UCB separately about the legal claims raised in the lawsuit. **Retaining your right to sue UCB may be important if you believe you have a claim for actual damages against UCB.** For instructions regarding exclusion, visit www.UnitedCollectionBureauSettlement.com, or call 1-844-245-3775. It is important to note that the deadline for requesting exclusion is March 7, 2015; – OR – OBJECT TO THE SETTLEMENT: Write to the Court about why you don't like the settlement. You may also appear at the fairness hearing. For instructions regarding objecting, visit www.UnitedCollectionBureauSettlement.com or by calling 1-844-245-3775. – OR – DO NOTHING: By doing nothing, you will remain a member of the class and you will give up your right to sue UCB separately about the claims raised in the lawsuit.

**Where Can I Get More Information?** You can obtain a detailed notice about the lawsuit (Graff v. United Collection Bureau, Inc., Case No. 2:12-cv-02402-GRB), other important court documents and contact information for Counsel representing the Class by visiting www.UnitedCollectionBureauSettlement.com, or by calling 1-844-245-3775. You can also contact Class Counsel by writing to: *Graff v United Collection Bureau, Heffler Claims Group, P.O. Box 60241, Philadelphia, PA 19102-0241.* You may also enter an appearance through an attorney if you so desire.

DE 75-2. In addition, at the website referenced in the short-form notice, class members were provided with a long-form notice containing greater detail. DE 58-2. Class members were also afforded the opportunity to utilize a telephone number for more information. *Id.*

The Preliminary Approval Order found that the Notice "satisfies each of the requirements of Rule 23(c)(2)(B) and adequately puts class members on notice of the proposed settlement." *Id.* at 11. Under the direction of class counsel, the settlement administrator sent the notice to all class members informing them of their right to opt out of or object to the settlement; after returns and remailings, 523,300 Settlement Class members received actual notice of the

Settlement.   Smitheman Decl., ¶ 11.  According to counsel, "Settlement Class Members have extensively utilized the Settlement Website, TelephoneAssistance Program, and mail to obtain more information about the Settlement, Smitheman Decl.,¶¶ 12-16, as well as communicating directly with Class Counsel, Thomasson Decl., ¶¶ 15."

A total of 66 Settlement Class members have requested exclusion from the Settlement, Smitheman Decl., ¶ 14; and one Settlement Class Member objected to the Settlement, DE 63.

### Terms of the Settlement and the Objections Thereto

The proposed settlement consists of primarily four elements:  First, the representative plaintiff shall receive $2,500 representing statutory damages plus a premium to recognize his services to the settlement class,  DE 58-2, ¶ 2.3(a)).  Second, UCB shall make a *cy pres* payment of $39,819.43 to the National Consumer Law Center, amounting to 1% of UCB's verified net worth basedupon consolidated financial statements for 2011, 2012, and through September 30, 2013.  *Id.* ¶ 2.3(b).[2]  Third, UCB will pay administration costs of up to $250,000.  *Id.,*¶ 2.4. Fourth, UCB shall pay counsel fees -- subject to Court approval -- of up to $175,000.00.  *Id.*, ¶ 2.3(c).  This Court granted preliminary approval of this settlement in the Preliminary Approval Order, DE 60, and a fairness hearing was conducted on May 5, 2015, DE 81.  Counsel for the objector filed papers and appeared at the settlement hearings and, as has happened before in FDCPA class action litigation, "helped transform the fairness hearing into a truly adversarial proceeding."  *Park v. Thomson Corp.,* 633 F. Supp. 2d 8, 11 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

---

[2] Section 1692k of Title 15, United States Code, provides that "in the case of a class action" the liability of the defendant is limited to "(i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector."  Thus, defendant's liability for  punitive damages is limited to up to $1,000 to the named plaintiff and 1% of its net worth -- which here amounts to approximately $40,000, to the class.

## DISCUSSION

### *Magistrate Judge Jurisdiction*

The objecting class member, BradleyGood ("Good") contends that the undersigned "lacks authority to grant final approval to the settlement," because exercise of such jurisdiction "deprives absent class members of their rights to adjudicate their claims before Article III judges."   DE 63 at 9.   While it is unclear whether Good has standing to raise this claim on behalf of other class members, his counsel joined issue at the fairness hearing by indicating that Good did not consent to the consideration of *his* claim by the undersigned under 28 U.S.C. §636. DE 81.

Section 636(c) of Title 28 provides as follows:

> Upon the consent of the parties, a full-time United States magistrate judge or a part-time United States magistrate judge who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves.

>         *           *           *

> The consent of the parties allows a magistrate judge designated to exercise civil jurisdiction under paragraph (1) of this subsection to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.

28 U.S.C.A. § 636(c)(1),(3).  Recently, in *Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932 (2015), the United States Supreme Court reaffirmed the exercise of consent jurisdiction by Article I judges.   Writing for the Court, Justice Sotomayor observed that:

> Article III, § 1, of the Constitution provides that '[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.'  Congress has in turn established 94 District

> Courts and 13 Courts of Appeals, composed of judges who enjoy
> the protections of Article III: life tenure and pay that cannot be
> diminished. Because these protections help to ensure the integrity
> and independence of the Judiciary, 'we have long recognized that,
> in general, Congress may not withdraw from' the Article III courts
> 'any matter which, from its nature, is the subject of a suit at the
> common law, or in equity, or in admiralty.'
>
> Congress has also authorized the appointment of bankruptcy and
> magistrate judges, who do not enjoy the protections of Article III,
> to assist Article III courts in their work. The number of magistrate
> and bankruptcy judgeships exceeds the number of circuit and
> district judgeships. And it is no exaggeration to say that without
> the distinguished service of these judicial colleagues, the work of
> the federal court system would grind nearly to a halt.

*Id.* at 1938-39.   In *Roell v. Withrow*, 538 U.S. 580, 590 (2003), the Court faced the issue of

whether implied consent -- arising from the advice of the need for consent combined with

subsequent participation in a proceeding before a magistrate judge -- provided a sufficient basis

for a constitutional exercise of jurisdiction.   The Court determined that "the better rule is to

accept implied consent where, as here, the litigant or counsel was made aware of the need for

consent and the right to refuse it, and still voluntarily appeared to try the case before the

Magistrate Judge."  *Id.*   Analogously, then, notice of the class action, which clearly provided that

jurisdiction would be exercised by a magistrate judge,[3] combined with the failure to opt out of

---

[3] Good argues that the notice of the consent to proceed before a magistrate judge was insufficient.  The long form notice, available to the class members on a public website (the URL address of which was heralded in the mailed short form notice) provided that:

"The Court will hold a Fairness Hearing on [date] at [time] a.m.in the courtroom of the Honorable Gary R. Brown, United States Magistrate Judge, 100 Federal Plaza, Courtroom 840, Central Islip, New York 11722. The purpose of the hearing will be for the Court to determine whether the proposed settlement is fair, reasonable, and adequate and in the best interests of the Class and to determine the appropriate amount of compensation for Class Counsel. At that hearing, the Court will be available to hear any objections and arguments concerning the fairness of the proposed settlement. We do not know how long the Court will take to make its decision."  DE 58-2.  In light of the plain language of the notice, it is difficult to credit Good's argument that the notice "does not indicate that the magistrate judge would be the final decisionmaker."  DE 63 at 13.   Faced with a similar argument, the Seventh Circuit held that "[i]n this case, the 'Notice of Pendency of Class Action, and Notice of Proposed Settlement and Hearing Thereon' that went to the unnamed *Williams'* class members clearly indicated that the lawsuit was before 'Magistrate Judge Joan H. Lefkow.' Due process requires no more."  *Williams v. Gen. Elec. Capital Auto Lease, Inc.,* 159 F.3d 266, 270 (7th Cir. 1998).   As such, I find that notice was sufficient.

the proceeding, would appear to give rise to a similar implied consent by absent class members. Some "members of the potential class did 'opt out,' which belies the contention that 'opt out' procedures result in guaranteed jurisdiction by inertia." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 813 (1985). Addressing the availability of an opt out mechanism, the Supreme Court observed that "the Constitution does not require more to protect what must be the somewhat rare species of class member who is unwilling to execute an 'opt out' form, but whose claim is nonetheless so important that he cannot be presumed to consent to being a member of the class by his failure to do so." *Id.*

As Good concedes, the undersigned is not writing on a blank slate. Three circuit courts have considered and rejected the very objection raised here. In *Williams,* 159 F.3d at 269, the Seventh Circuit rejected a nearly identical claim, noting that "absent class members are not 'parties' before the court in the sense of being able to direct the litigation," and concluding that "the lack of consent of someone who is not a party to an action does not deprive the magistrate judge of jurisdiction." The Seventh Circuit held that:

> An unnamed class member who prefers an Article III forum has two options. First, she may apply to the district court to intervene under Rule 24(a), become a party to the lawsuit, and then exercise her right to withhold her consent to proceed before the magistrate. or, after the entry of final judgment, the unnamed class member can raise a collateral attack based on due process against the named representative's decision to consent under § 636(c).

*Id.* at 269-70. In *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170 (3d Cir. 2012), the Third Circuit, relying on *Williams*, similarly rejected a nearly-identical claim. *Id.* at 182. (agreeing with the Seventh Circuit that "unnamed class members are not 'parties' within the meaning of § 636(c)(1), and that their consent is not required for a magistrate judge to exercise

jurisdiction over a case."). The Eleventh Circuit has joined this chorus of appellate precedent, concluding that "absent class members are not 'parties' whose consent is required for a magistrate judge to enter a final judgment under section 636(c)." *Day v. Persels & Associates, LLC*, 729 F.3d 1309, 1316 (11th Cir. 2013). And while Good further argues that, as applied, §636 violates Article III, the Eleventh Circuit similarly rejected such an argument. *See Day v. Persels & Associates, LLC*, 729 F.3d at 1324 ("section 636(c) does not violate Article III as applied to class actions"). The weight of this authority is persuasive, and the objection is without merit.

**Review of the Proposed Settlement**

Any compromise of claims brought on a class basis requires judicial review pursuant to Rule 23(e). Approval of a proposed settlement is a matter within the trial court's discretion, exercised in recognition of the policy encouraging settlement of disputed claims. *See Joel A. v. Giuliani,* 218 F.3d 132, 139 (2d Cir. 2000). In exercising its discretion, a court should be mindful of the "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 116 (2d Cir. 2005). To determine whether a class settlement is fair, a court must examine both the settlement's procedural and substantive fairness. *See Hayes v. Harmony Gold Mining Co.,* 509 F. App'x 21, 22 (2d Cir. 2013).

### *The FDCPA*

The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA "establishes certain

rights for consumers whose debts are placed in the hands of professional debt collectors for collection, and requires that such debt collectors advise the consumers whose debts they seek to collect of specified rights." *DeSantis v. Computer Credit, Inc.,* 269 F.3d 159, 161 (2d Cir.2001). Because the FDCPA is "remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." *Vincent v. The Money Store*, 736 F.3d 88, 98 (2d Cir. 2013).

Congress enacted the FDCPA because of collection abuses such as use of "obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process." S. Rep. No. 95–382, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. The FDCPA sets forth specifically prohibited practices, including the "failure to disclose in the initial [oral] communication with the consumer . . . that the debt collector is attempting to collect a debt," and "the failure to disclose in subsequent communications that the communication is from a debt collector."  15 U.S.C. §1692e (11). Courts have repeatedly found that debt collectors who fail to identify themselves and the nature of their effort in answering machine messages violate the statute.  *Pifko v. CCB Credit Servs., Inc.,* No. 09-CV-3057 (JS), 2010 WL 2771832, at *5 (E.D.N.Y. July 7, 2010) ("messages left on consumers' answering machines that fail to disclose that the speaker is a debt collector seeking to collect a debt have been found to be in violation of section 1692e(11)") (collecting cases).

### *Procedural Fairness*

The procedural fairness inquiry requires the court to scrutinize the negotiation process "in light of the experience of counsel, the vigor with which the case was prosecuted, and the

coercion or collusion that may have marred the negotiations themselves." *Payment Card Interchange Fee & Merch. Discount Antitrust Litig.,* 986 F. Supp. 2d 207, 221 (E.D.N.Y. 2013) (internal quotation marks and citations omitted). There is a presumption of procedural fairness "as to the settlement where a class settlement [is] reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *McReynolds v. Richards-Cantave,* 588 F.3d 790, 803 (2d Cir. 2009) (internal quotation marks and citation omitted). Indeed, "absent evidence of fraud or overreaching [courts] consistently have refused to act as Monday Morning quarterbacks in evaluating the judgment of counsel." *Trief v. Dun & Bradstreet Corp.,* 840 F. Supp. 277, 281 (S.D.N.Y. 1993).

In the instant case, "the Parties have in fact conducted substantial discovery (written and depositions), have briefed and argued extensive discovery motions, and have engaged in protracted mediation and negotiations resulting in the Settlement." *See* Mem. of Law at 16. Having worked extensively on this matter, the undersigned agrees with this assessment. In fact, the undersigned intervened in several discovery disputes between the parties, suggesting that counsel vigorously discharged their responsibilities. *See, e.g.,* DE 1-29. In light of these facts, the Court finds that the settlement is entitled to the presumption of procedural fairness.

### *Substantive Fairness*

Substantive fairness of a proposed settlement is evaluated under the factors enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). *See Hayes,* 509 F. App'x at 22. This analytical framework includes the following *Grinnell* factors: (a) the complexity, expense and likely duration of the litigation; (b) the reaction of the class to the settlement; (c) the stage of the proceedings and the amount of discovery completed; (d) the risks of establishing liability, damages, and maintaining the class action through the trial; (e) the ability of the defendants to

withstand a greater judgment; (f) the range of reasonableness of the settlement fund in light of the best possible recovery and all attendant risks of the litigation. *Id.*; *see McReynolds,* 588 F.3d at 804.

In the instant case, there are several factors weighing in favor of the settlement. First, as counsel observes:

> The FDCPA limits class damages to the lesser of $500,000 or 1% of the debt collector's net worth. 15 U.S.C. § 1692k(a)(2)(B). Here, as a result of in-depth settlement discussions the Parties agreed UCB will pay $39,819.43 to the Settlement Class, which is the maximum damages available under the FDCPA. See 15 U.S.C. § 1692k(a)(2)(B)(ii). Similarly, Plaintiff received $1,000.00, which is the maximum allowable individual relief available. See 15 U.S.C. § 1692k(a)(2)(B)(i). A trial in this case would be expensive and lengthy and continued litigation, including hiring experts and possible appeals, could have depleted UCB's resources to pay any judgment or possible future settlement thereby making early settlement even more valuable to class members. As such, considering the uncertainties of trial and the possible difficulty in ultimately proving class liability and damages against UCB, the proposed Settlement is clearly fair, reasonable, and adequate – particularly in view of the fact that Plaintiff recovered the maximum available class and individual damages. Indeed, neither Plaintiff nor the Settlement Class could have obtained a judgment at trial against UCB in excess of what they obtained in the Agreement.

Memo at 17. Moreover, the reaction of the class appears to be positive, with only 66 opt-outs and one objector from a class of more than half a million members.

It is the final factor -- the range of reasonableness of the settlement fund -- which provides the most difficulty. "[T]here is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96,119 (2d Cir. 2005) (citation omitted). "In other words, the question for the Court is not whether the settlement represents the highest

recovery possible . . . but whether it represents a reasonable one in light of the many uncertainties the class faces." *Bodon v. Domino's Pizza, LLC,* No. 09-CV-2941 (SLT), 2015 WL 588656, at *6 (E.D.N.Y. Jan. 16, 2015) (internal quotation marks and citation omitted).

Here, several issues undermine overall fairness of the settlement.

### *Potential Efficacy of the Settlement in Effectuating the Goals of the FDCPA*

"Congress intended the 'private attorney general' enforcement mechanism of the FDCPA to facilitate the deterrent and curative effect of eliminating abusive collection practices."*Egge v. Healthspan Servs. Co.,* 208 F.R.D. 265, 272 (D. Minn. 2002). As the Second Circuit has made clear, "the FDCPA enlists the efforts of sophisticated consumers . . . as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others." *Jacobson v. Healthcare Fin. Servs., Inc*., 516 F.3d 85, 91 (2d Cir. 2008) (interpreting the FDCPA so as to give effect to "the Act's overarching purpose of deterring deceptive conduct"); *cf. Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 603(2010) (discussing "FDCPA's calibrated scheme of statutory incentives to encourage self-enforcement"). Courts have relied on this deterrent effect as one factor in interpreting the statute generally and, more specifically, in approving class actions. *See, e.g.,Hernandez v. Guglielmo*, 977 F. Supp. 2d 1054, 1055 (D. Nev. 2013) (upholding right to punitive damages for class members based upon deterrent factors described in *Jacobson*); *Carbajal v. Capital One*, 219 F.R.D. 437, 443 (N.D. Ill. 2004) ("the threat of a class action has a potent deterrent effect"); *Wilborn v. Dun & Bradstreet Corp.,* 180 F.R.D. 347, 358 (N.D. Ill. 1998) ("a successful class action will have a stronger deterrent effect on defendant than would the handful of individual actions").

Given the unusual, if not unique, litigative history of this matter, very little weight can be given to the potential ameliorative effects of the proposed settlement.  In the *Gravina* litigation, defendant settled a nationwide class action arising from nearly identical allegations based upon, as is proposed here, payment of a *cy pres* award, attorneys' fees and related costs, *plus* the imposition of an injunction.  Nevertheless, defendant proceeded to engage in the very same activity on a broad scale.  It can hardly be said that the "underlying Congressional purpose" of the FDCPA had been "effectuated" by the *Gravina* settlement, which raises the question about whether the instant settlement would likely fare any better in this regard, particularly in absence of injunctive relief.[4]  *See Vincent v. The Money Store*, 736 F.3d at 98.   Thus, the absence of any likely deterrent effect, particularly where there are no other measurable benefits to class members, raises questions about the adequacy and reasonableness of the settlement.

### *Scope of Release*

Good objects to the settlement as not being "fair, reasonable and adequate" based in part, on the scope of the release, which goes beyond claims brought under the FDCPA.  DE 63 at 2. The release is described as follows:

> the proposed settlement provides for the class members to receive
> no money -- zero.  The class representative is proposed to receive
> $2,500 and a *cy pres* payment of $39,819 is proposed to be made
> to a consumer non-profit.  In exchange for these payments, at least
> 526,954 class members (but maybe 650,000 or more, Doc. 58-2, p.
> 5 of 41) across the United States will release "any and all claims
> for damages, including unknown claims for such relief arising out
> of or related to the factual allegations and legal claims asserted in
> the action arising out of federal or state law, including but not
> limited to any and all such claims relating to defendant's use of

---

[4] Significantly, the Second Circuit has since raised questions, specifically growing out of the *Gravina* litigation, about whether the FDCPA authorizes such injunctive relief. *Hecht v. United Collection Bureau, Inc.,* 691 F.3d 218, 224 (2d Cir. 2012) ("We do not here decide whether the FDCPA permits private plaintiffs to seek injunctive relief because the issue is not squarely presented, but we note that every federal appeals court to have considered the question has held that it does not").

> messages on telephone answering devices."  Stipulation of
> Settlement, ¶ 4.2 (Docket 58-2, p. 15of 21).   Further, the class
> members (and "any of their respective heirs, spouses, executors,
> administrators, partners, attorneys", etc.) release all claims or
> causes of action under state or federal law, known or unknown,
> asserted or unasserted, alleged in the Complaint or Amended
> Complaint " and/or any claims that could have been brought
> arising out of the allegations set forth in the Complaint and/or
> Amended Complaint."  Release, ¶ 4.3 (emphasis added). Indeed,
> the release sections, ¶ 4.2, 4.3 and 4.4 run on for nearly 1½  full
> pages.  Presumably the sweeping release bars claims for telephone
> abuse or harassment under the FDCPA, 15 U.S.C. § 1692f, and
> even claims arising under the Telephone Consumer Protection Act,
> 47 U.S.C. § 227, for improper calls to a consumer's cellphone.

*Id.* at 2.  Good observes that while "broad releases are not uncommon, a broad release here is

inappropriate given the small value of the benefit afforded the class."  DE 74 at 3.  Objector Good

cites to other potential claims, such as claims under the Telephone Consumer Protection Act (TCPA),

which would be swept into the class action settlement release as presently drafted.

In response, plaintiffs generally respond that such releases are routine, and therefore

appropriate.  "The Second Circuit has even acknowledged that a settlement could properly prevent

class members from subsequently asserting claims relying on a legal theory different from that relied

upon in the class action complaint, but dependent on the same set of facts."  *TBK Partners, Ltd.*,

675F.2d at 460 (citing *National Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d

Cir.1981))."  DE 71 at 12.   Plaintiffs further assert that the fact that the released claims are not of

"high economic value" weighs in favor of approval of a broad release.  DE 71 at 6-7.  "In the present

action," plaintiffs point out, "the released claims against UCB are not of a high economic value –

specifically, approximately$.07 per class member."  *Id.*

That plaintiffs herald the value of the released *claims* to be ".07 per class member," ignores

several facts.  First, this figure is the amount of settlement payment, not the value of the released

claims.  The released *claims* have a far greater value.  Second, this figure is a function of the FDCPA

liability cap divided by the number of class members (an entirely separate issue dealt with below). Thus, the figure, and the argument, are both artificial and unpersuasive.

In their struggle over the scope of the release, the parties fail to address the Gordian knot raised by this objection. The problem in this particular case is that the liability cap of the FDCPA specifically limits the settlement to one percent of the gross revenue of the defendant -- a limitation not contained in other applicable provisions -- such as the TCPA -- or under other legal theories. Should the defendant be given the benefit of the FDCPA liability cap to then obtain a release as to other legal claims that do not contain such a limitation? In other words, can the liability limitations of the FDCPA be used as both a shield and a sword?

While plaintiffs contend that a release of this nature is common practice, there is little precedent to support granting a broad release in these circumstances. One of the few cases to deal with this issue in a related context -- though not precisely on all fours -- is *Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, No. CV-04-2195 (CPS), 2006 WL 3681138 (E.D.N.Y. Dec. 11, 2006). In that case, objectors to an FDCPA class action settlement argued that the proposed release was overbroad because it encompassed claims other than claims under the FDCPA. *Id.* The *Reade-Alvarez* decision rejected the argument that the release should be limited to FDCPA claims only, though the court did modify the release to include only claims based upon an "identical factual predicates." *Id.* at *10-11; *see accord Brent v. Midland Funding, LLC,* No. 3:11 CV 1332, 2011 WL 3862363, at *13 (N.D. Ohio Sept. 1, 2011) ("the release is properly limited to claims that share a factual predicate with the claims pled in the complaint" in FDCPA class action case). The class action *cy pres* payment in *Reade-Alvarez* appears to have exceeded the liability cap, and the case does not expressly deal with the relationship between that cap and the scope of the release. *Compare Reade-Alvarez,* 2006 WL 3681138, at *4 (discussing $15,000 *cy pres* payment) *with Id.* at *8 ("the class as a whole in any event could only receive $10,000 under the statute").

In *Zimmerman v. Zwicker & Associates, P.C.,* No. 09-3905 (RMB/JS), 2011 WL 65912, at *7 (D.N.J. Jan. 10, 2011), the court rejected a similar *cy pres* settlement of an FDCPA class action at the statutory cap in part because of the scope of the release. "It is troubling that the settlement requires that all present claims, lawsuits, etc. against the defendant 'arising out of or related to the same or similar circumstances, transactions or occurrences as are alleged in this case' be barred." *Id.* at *7.

While the case law in this area is not well developed, I find that where, as here, the parties predicate the settlement of an FDCPA class action upon the limitations of liability contained in that statute, the release issued in connection with that settlement should not encompass claims other than those under the FDCPA. This principle applies with particular force to a *cy pres* settlement, in which class members are obtaining nothing of value. To hold otherwise would result in a settlement that is not "fair, adequate and reasonable" vis-à-vis class members, who would be waiving claims of potentially significant value in exchange for no consideration. Therefore, the scope of the proposed release undermines the fairness of the settlement.

### *Size of the Class*

As noted above, plaintiffs commenced this action on behalf of the New York class, but during the course settlement negotiations expanded the action to encompass the Nationwide class. This change has several effects, not the least of which is to dramatically decrease the value assigned to each class action plaintiff while broadly increasing the protection afforded to defendant. The Objector highlights this issue, describing this as the "thrust of Good's objection," and arguing that the expansion of the class without any individual relief for class members renders "*this* diluted class settlement inadequate and unreasonable." DE 63 at 2. The

objector suggests that "[n]o doubt, the defendant here is anxious to purchase *res judicata* in the broadest possible scope at the cheapest price." DE 63 at 4. While the undersigned does not necessarily accept this characterization, the parties have not proffered any valid explanation for the sweeping increase in the size of the class without any concomitant increase in the value of the settlement to that class.

One court rejected an FDCPA settlement on identical grounds, observing:

> in *Mace*, *supra,* 109 F.3d at 344, the Court wrote, "if a debt collector is sued in one state, but continues to violate the statute in another, it ought to be possible to challenge such continuing violations." In addition, in *Sanders v. Jackson*, 209 F.3d 998, 1002 (7th Cir.2000), the Court stated, "there is no provision that limits defendants being exposed to more than one FDCPA class action lawsuit, which is exactly what happened to the defendant in this case." *See also Balogun v. Midland Credit Mgmt., Inc.*, 2007 WL 2934886, at \*7 (S.D. Ind. Oct 5, 2007) ("[T]he Seventh Circuit has held that the FDCPA requires neither a nationwide class, ..., nor a limit on Defendants' exposure to more than one FDCPA class action suit"); *Nichols v. Northland Groups, Inc.,* 2006 WL 897867 (N.D.Ill. March 31, 2006); *D'Alauro v. GC Servs. Ltd. P'ship*, 168 F.R.D. 451, 455 (E.D.N.Y.1996).

*Zimmerman*, 2011 WL 65912, at \*6; *see also Mace*, 109 F.3d at 341 ("the class requirements found in the Federal Rules of Civil Procedure encourage rather specific and limited classes").

I must agree that the unexplained exponential increase in the size of the class without any measurable benefit to class members renders the settlement, as drafted, inadequate and unreasonable. Importantly, as Judge Spatt has observed:

> Once a court determines that class certification is appropriate, "[t]he next question is whether the definition of the class proposed by [the] plaintiff[ ] ... is an appropriate one." *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg,* 287 F.R.D. 240, 250 (S.D.N.Y.2012). In this regard, "[u]nder rule 23, district courts have the power to amend class definitions or decertify classes as necessary.... 'In fact, the court has a duty to ensure that the class is properly constituted and has broad discretion to modify the class

> definition as appropriate to provide the necessary precision.' " *Id.*
> (*quoting Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 114
> (E.D.N.Y.2011)).

*Diaz v. Residential Credit Solutions, Inc.*, 297 F.R.D. 42, 54-55 (E.D.N.Y. 2014) (modifying the definition of the class where the Court determined the class to be "overinclusive").Therefore, I find that -- irrespective of whether the settlement proceeds, the Nationwide class is overinclusive, and this action is hereby modified to consist solely of the New York class.

### Propriety of an Exclusive Cy Pres Remedy

As the Second Circuit has noted:

> The *cy pres* doctrine takes its name from the Norman French
> expression, *cy pres comme possible*, which means 'as near as
> possible.' The doctrine originated to save testamentary charitable
> gifts that would otherwise fail. Under *cy pres*, if the testator had a
> general charitable intent, the court will look for an alternate
> recipient that will best serve the gift's original purpose. In the class
> action context, it may be appropriate for a court to use *cy pres*
> principles to distribute unclaimed funds. In such a case, the
> unclaimed funds should be distributed for a purpose as near as
> possible to the legitimate objectives underlying the lawsuit, the
> interests of class members, and the interests of those similarly
> situated.

*In re Holocaust Victim Assets Litig.*, 424 F.3d 158, 161 (2d Cir. 2005) (*quoting In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682–83 (8th Cir.2002) (internal alterations omitted)). It is beyond question that the *cy pres* doctrine has a well-developed history, particularly in cases dealing with the distribution of excess or unclaimed funds. *See, e.g., In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d at 682-83 (providing for the distribution of unclaimed funds in class action settlement); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 158 (2d Cir.1987) (approving a *cy pres* remainder award after 75% of class action payments went directly to victims).

Less clear in the case law is the authority by which courts can approve the kind of settlement proposed here -- an agreement in which, other than a payment to the named plaintiff, none of the funds are awarded to any class members, but rather are entirely supplanted by payment to a *cy pres* recipient.  In *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir. 2007), the Second Circuit provided *some* support for this notion, observing:

> the District Court should bear in mind that the purpose of Cy Pres distribution is to "put[ ] the unclaimed fund to its *next best* compensation use, *e.g.*, for the aggregate, indirect, prospective benefit of the class."  2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:17 (4th ed. 2002) (emphasis supplied).  Cy Pres means "as near as possible," and "[c]ourts have utilized Cy Pres distributions where class members are difficult to identify, or where they change constantly, or where there are unclaimed funds."  *Id*. at § 10:16 n. 1.  In this connection, we take note of the recent Draft of the Principles of the Law of Aggregate Litigation by the American Law Institute.  With respect to the approval of settlements providing for a Cy Pres remedy, the Draft proposes a rule limiting Cy Pres "to circumstances in which direct distribution to individual class members is not economically feasible, or where funds remain after class members are given a full opportunity to make a claim."  Draft § 3.08, entitled "Cy Pres Settlements."  This proposed rule is consonant with the observation of our sister circuit that "[f]ederal courts have frequently approved [the Cy Pres] remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly."  *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir.1990).

However, the language in *Masters* is ultimately *dicta*, as that case involved the distribution of "excess funds" after payments to plaintiff-victims.  *Id.*at 434.   Indeed, despite extensive research, the Court has been unable to locate a single Second Circuit case approving a class action resolution involving a *cy pres* award which represented the *exclusive* remedy for the class, as compared to cases involving excess, unclaimed or residual funds.   While some district courts have approved settlements providing for exclusive *cy pres* remedies in the class action context,

others have rejected such terms.  *Compare Reade-Alvarez,* 2006 WL 3681138, at *4 (approving

exclusive *cy pres* award in FDCPA case) *with Park v. The Thomson Corp.,* No. 05 Civ. 2931

(WJP), 2008 WL 4684232, at *2 (S.D.N.Y. Oct. 22, 2008) (approving settlement revised to

accommodate court's "concerns that the ethereal, albeit well intentioned, *cy pres* component of

the Initial Settlement would overwhelm the purpose for the lawsuit-payment to the class" by

"provid[ing] that Class Members would receive the entirety of the Fund").

   In connection with a denial of certiorari in *Marek v. Lane*, 134 S. Ct. 8 (2013), Chief

Justice Roberts raised:

> fundamental concerns surrounding the use of such remedies in
> class action litigation, including when, if ever, such relief should
> be considered; how to assess its fairness as a general matter;
> whether new entities may be established as part of such relief; if
> not, how existing entities should be selected; what the respective
> roles of the judge and parties are in shaping a cy pres remedy; how
> closely the goals of any enlisted organization must correspond to
> the interests of the class; and so on.  This Court has not previously
> addressed any of these issues.  *Cy pres* remedies, however, are a
> growing feature of class action settlements.  In a suitable case, this
> Court may need to clarify the limits on the use of such remedies.

*Id.* at 9; *cf.  In re Baby Products Antitrust Litig.,* 708 F.3d 163, 174 (3d Cir. 2013) ("Barring

sufficient justification, *cy pres* awards should generally represent a small percentage of total

settlement funds").  In rejecting a largely *cy pres* class action settlement, the Seventh Circuit

harshly criticized the use of this approach:

> The reference is to the trust doctrine that if the funds in a charitable
> trust can no longer be devoted to the purpose for which the trust
> was created, they may be diverted to a related purpose; and so the
> March of Dimes Foundation was permitted to reorient its activities
> from combating polio to combating other childhood diseases when
> the polio vaccine was developed.  The doctrine, or rather
> something parading under its name, has been applied in class
> action cases, but for a reason unrelated to the reason for the trust
> doctrine.  That doctrine is based on the idea that the settlor would

> have preferred a modest alteration in the terms of the trust to having the corpus revert to his residuary legatees. So there is an indirect benefit to the settlor.  In the class action context the reason for appealing to cy pres is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement (or the judgment, in the rare case in which a class action goes to trial) to the class members. There is no indirect benefit to the class from the defendant's giving the money to someone else.  In such a case the "*cy pres*" remedy (badly misnamed, but the alternative term—"fluid recovery"—is no less misleading) is purely punitive.

*Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781, 784 (7th Cir. 2004) (citations omitted).

Where, as here, the defendant is attempting to repeatedly settle class action litigation by crafting *cy pres* remedies providing virtually no relief to class members, these concerns are heightened.

Even though the sole objector seemingly agrees to the propriety of the *cy pres* remedy in this case, *see* DE 63 at 3 ("a *cy pres-only* class settlement may be appropriate in cases where class members' claims are of very small value"), I cannot agree.  When combined with the other factors listed above, the limitation of the settlement to a *cy pres* payment representing no measurable benefit to class members renders the settlement fundamentally unfair, unreasonable and inadequate.

## CONCLUSION

For the reasons set forth herein, the Court hereby denies the motion for final approval of the class settlement.  Of course, this denial is without prejudice to any motion to consider a settlement drafted in conformity with the principles contained herein.  Moreover, the motion for final certification of the class is granted only insofar as said class is limited to theNew York class consistent with the original complaint.

**SO ORDERED.**

Dated: Central Islip, New York
        January  6, 2016

/s/ Gary R. Brown
GARY R. BROWN
United States Magistrate Judge